UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Israel College-Educational
Horizons, Ltd.

    v.                            Civil No. 05-cv-392-JD
                                        Opinion No. 2008 DNH 011


Southern New Hampshire
University


O R D E R


Israel College-Educational Horizons, Ltd. ("IC") brings breach of contract and breach of the implied duty of good faith and fair dealing claims against Southern New Hampshire University ("SNHU"), arising from the schools' efforts to affiliate for purposes of providing SNHU courses and degrees at IC campuses. IC filed a motion for summary judgment on liability only.[1]  SNHU filed an objection to IC's motion for summary judgment, contending that factual issues exist about the parties' agreement which preclude summary judgment.  IC filed a reply to this objection.

---

[1]The court notes that IC has filed its Memorandum of Law in Support of Partial Summary Judgment separate from its Statement of Undisputed Material Facts.  This is a violation of L.R. 7.2(b)(1).  In doing so, IC's filing is more than twenty-five pages, which also is a violation of L.R. 7.1(a)(3).  The court expects IC to comply strictly with the local rules in the future.

Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, the court must then determine whether the non-moving party has demonstrated a triable issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. E.g., J.G.M.C.J. Corp. v. Sears, Roebuck & Co., 391 F.3d 364, 368 (1st Cir. 2004); Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004).

At the outset, the court notes that "[w]here, as is the case here, the party moving for summary judgment bears the burden of proof on an issue, [the party] cannot prevail 'unless the evidence that [it] provides on that issue is conclusive.'" EEOC v. Union Independiente de la Autoridad de Acueductos y

2

Ancantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002) (quoting
Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir.
1998)).  Evidence is conclusive if: "(1) the moving party
initially produces enough supportive evidence to entitle the
movant to judgment as a matter of law (i.e., no reasonable jury
could find otherwise even when construing the evidence in the
light most favorable to the non-movant), and (2) the non-movant
fails to produce sufficient responsive evidence to raise a
genuine dispute as to any material fact."  Murphy v. Franklin
Pierce Law Ctr., 882 F. Supp. 1176, 1180 (D.N.H. 1994)(citing
Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir.
1993)).  Summary judgment will not be granted as long as a
reasonable jury could return a verdict in favor of the nonmoving
party.  Liberty Lobby, Inc., 477 U.S. at 248.


                          Background

     SNHU, a university located in Manchester, New Hampshire,
offers both graduate and undergraduate degrees.  IC, a college
located in Israel, partners with American institutions to provide
courses at a branch campus in Israel, leading to degrees from
American institutions.

     Beginning in 1994, IC partnered with New England College to
provide undergraduate business courses at a branch campus in

                              3

Israel and also partnered with Clark University, offering master's level curriculum in several fields.  In 1998, IC partnered with Northeastern University, offering master's level course work and with the University of New England, offering undergraduate classes in business administration.

By 2001, New England College and IC were dissatisfied with their relationship.  In late 2001 or early 2002, IC sought a new American institution to replace New England College.  For this reason, in early 2002, Yigal Ne'eman, president of IC, contacted Paul Schneiderman, dean of SNHU's business school, to ascertain SNHU's interest in establishing a branch campus in Israel.  In early 2002, Schneiderman toured IC's campus and informed Richard Gustafson, president of SNHU, that he thought there was potential for an affiliation.  Schneiderman also spoke with other institutions, including Clark University and New England College, to ascertain their experiences with IC.

In March of 2002, Ne'eman and members of his management staff visited SNHU in order to discuss a potential affiliation between the two schools.  At this time, the two schools began drafting the documents required for an affiliation.  Ultimately, Gustafson decided not to go forward with the affiliation.  The two schools did not communicate between March of 2002 and February of 2004.

4

As of February of 2004, IC still had not found a new partner institution to replace New England College.  At this time, Ne'eman heard that SNHU had a new president, and consequently, emailed Schneiderman to determine if SNHU was interested in resuming discussions regarding an affiliation between the two schools.  Schneiderman forwarded Ne'eman's inquiry to Paul LeBlanc, the new president of SNHU.  Schneiderman briefly described to LeBlanc the 2002 discussion between the two schools and SNHU's original rationale for not pursuing an affiliation with IC.  LeBlanc agreed to meet with Ne'eman.

In early March of 2004, Ne'eman traveled to SNHU and met with LeBlanc and Schneiderman to discuss a potential affiliation between the two schools.  At this time, they discussed the requirement that an affiliation needed the approval of two regulatory agencies: (1) the Israel Council of Higher Education ("Israeli HEC") and (2) the New England Association of Schools and Colleges ("NEASC").

According to LeBlanc, Ne'eman explained that the Israeli HEC application process was very lengthy, and for this reason, IC needed two documents to begin the procedure: (1) an agreement between IC and SNHU and (2) a letter from NEASC indicating that it authorized the affiliation.  LeBlanc told Ne'eman that "providing those two items immediately was not the usual course

and that [SNHU] would need to conduct due diligence on the
collaboration and have a full look at [Israel College's]
operations before [SNHU] could commit to a partnership."  SNHU
Objection to IC Motion for Summary Judgment ("SNHU Obj."), Ex. G,
¶7.  He also told Ne'eman that there were "many, many other
internal steps that needed to be taken before SNHU could agree to
a partnership."  Id.  LeBlanc testified that SNHU agreed to sign
the necessary documents to "begin our process" but only "as a
favor" to IC.  SNHU Obj., Ex. F, at 50 and 164.  In an affidavit
submitted with SNHU's objection to summary judgment, LeBlanc
stated that "to accommodate [Ne'eman], we agreed at the meeting,
that we would sign the documents necessary to begin the process,
but that they would not be final, binding agreements.  Instead,
they would be subject to SNHU's satisfactory completion of due
diligence and, of course, NEASC approval."  SNHU Obj., Ex. G, ¶9.
LeBlanc explained that "due diligence would consist of, at a
minimum, conversations with other schools, and the drawing up of
budgets and enrollment projections, and a site visit."  Id.

     Ne'eman has a different recollection of the March 2004,
meeting with LeBlanc and Schneiderman.  Ne'eman testified that
LeBlanc asked, "what should we do in order to go ahead?"  IC
Motion for Summary Judgment ("IC Summ. J."), Ex. A, at 87.
Ne'eman responded, "we have to do two things in parallel, one to

work up the agreements and then to make the preparations for the
petition for the [Israeli] Council for Higher Education because
it takes between, around twelve months, maybe fifteen months."
Id.  Ne'eman also stated that "the idea was that [the schools]
will finalize the agreement within a month and [the] preparation
[of] the petition will take three to four months" and "that it
was clear that the agreement will be signed beforehand."  Id. at
88-89.  According to Ne'eman, after Ne'eman explained the process
for going forward, LeBlanc responded, "[l]et's go ahead" but said
nothing further.  Id. at 89.

     Schneiderman testified that as a result of the meeting,
there was "a general agreement to move ahead with the prospect."
IC Summ. J., Ex. G, at 49.  He also stated that the next step
after the meeting was "that documents would have to be prepared
by the university in conjunction with Israel College, and that
work on those documents had to begin."  Id.  Both schools agree
that no contract was signed at the meeting.

     After the meeting, the two schools began drafting an
agreement.  Schneiderman asked Elizabeth Elwy, an assistant dean
at SNHU, to work on the agreement.  LeBlanc provided Elwy with a
form of an agreement, which he had used previously at another
college where he had worked, to "look at and use."  IC Summ. J.,
Ex. U, at 29.  On March 10, 2004, Elwy wrote in an email to IC

7

that, "[t]he President [LeBlanc] has requested that we use a new format of [the] Articulation Agreement.  The content will remain the same but the format is quite different.  I will do my best to fill in the blanks and send it along for you to review and comment on soon."  IC Summ. J., Ex. W.[2]

In April of 2004, Ronit Mlynarsky from IC traveled to the United States to meet with several colleges and universities, including SNHU.  According to Mlynarsky, while she was visiting SNHU, Ne'eman instructed her to end her visit early because there was not yet an agreement between the two schools.  Mlynarsky then went to visit another university.  While she was visiting this school, LeBlanc invited her to a dinner meeting in Natick, Massachusetts, with NEASC officials and another college administrator.  On April 21, 2004, Mlynarsky, LeBlanc, Sandra Featherman, the president of the University of New England, and NEASC staff members, including Barbara Brittingham, had dinner in Natick, Massachusetts.

Mlynarsky testified that she met with LeBlanc for a drink before dinner and LeBlanc asked her "lots of questions about Israel College and how it operates, tons, tons of questions and

---

[2]At LeBlanc's deposition, he noted that Elwy misspoke and actually meant the Academic Supervision Agreement, described, <u>infra</u>.

[she] felt like [she was] under investigation."  IC Summ. J., Ex.
T, at 58.  LeBlanc also asked her about IC's partnerships with
other schools.  As a result of this discussion, Mlynarsky
believed that "LeBlanc was interested.  He was asking questions
that were really showing interest in the program."  Id. at 66.
According to Mlynarsky, during dinner, LeBlanc asked Featherman
about IC's relationship with the University of New England.  He
asked Brittingham many questions, including ones about obtaining
NEASC approval.  After dinner, LeBlanc escorted Mlynarsky to her
car and said "that he's happy with what Barbara [Brittingham]
said, that it can be done, [was happy] with what Sandra
Featherman said, and that he's going to sign the contract."  Id.
at 73.

     LeBlanc has a different recollection of the April 2004
dinner.  LeBlanc stated in his affidavit that "during dinner, the
topics of conversation, other than social banter, included a very
general discussion of Israel College.  I did not, however, engage
in extensive questioning or discussion of Israel College's
operations, programs, or management."  SNHU Obj., Ex. G, ¶¶13-14.
He testified at his deposition that the goal of the dinner
meeting was to "try and understand the problem we had with
[Ne'eman's] need to get a letter of approval to the appropriate
Israeli approving parties or licensing parties," and "to

understand how we might best proceed."  SNHU Obj., Ex. F, at 41.
According to LeBlanc, he did not speak with Mlynarsky after
dinner, he did not tell Mlynarsky that he "would sign the
agreements," and "he did not escort Mlynarsky" to her car.  SNHU
Obj., Ex. G, ¶¶16-17.

Two days after the Natick dinner, on April 23, 2004, LeBlanc
signed the agreement and sent it to Ne'eman for his signature.
On April 25, 2004, Ne'eman emailed the president of New England
College informing her that the agreement with SNHU was a "done
deal."  IC Summ. J., Ex. TT.  On May 2, 2004, Ne'eman signed the
agreement.

It is undisputed that the parties' agreement was expressed
in two documents: the Affiliation Agreement ("AA") and the
Academic Supervision Agreement ("ASA"), (collectively "the
Contract").  The ASA outlines the responsibilities of each party
with respect to curriculum, faculty, admission criteria, and
other program details.  The AA outlines the parties' contractual
obligations, including warranties, representations, and
consideration.  Clause 1.1 of the AA states that "[t]his
agreement is effective from July 1st 2005 and unless terminated
earlier pursuant to the provisions of Clauses 7.1, 7.2, and 7.3
continues on a rolling basis with annual review and termination

at twenty four months notice and a four year teach out period."[3]
IC Summ. J., Ex. Y.  The AA states that "implementation of these
programs require [sic] approval both [sic] NEASC and the Council
for Higher Education in Israel."  Id. ¶7.7.  The AA includes an
integration clause which reads:

> Entire Agreement:  This Agreement (together with annexures)
> constitutes the entire agreement between the parties and
> save as otherwise expressly provided no modification,
> amendment, or waiver of any of the provisions of this
> Agreement shall be effective unless made in writing and duly
> signed by both parties hereto.

Id. ¶10.  A choice of law clause states that the Contract "shall
be governed by and construed in accordance with the laws of the
State of New Hampshire and the United States of America."  Id.
¶13.1.

     After the Contract was signed, the two schools continued
work on obtaining regulatory approval.  In order to obtain
Israeli HEC approval, IC needed to submit a letter from NEASC
stating that it had approved the affiliation.  On June 9, 2004,
LeBlanc emailed Ne'eman, explaining that NEASC could not approve
the program until the parties submitted a document titled,

---

[3]Clause 7.1 defines the default events for early termination
of the Contract.  Clause 7.2 states that if either party commits
a default event, "the other party may terminate the agreement"
within 30 days.  IC Summ. J., Ex. Y.  Clause 7.3 of the AA states
that the AA will continue in force unless either party gives the
other at least twenty-four months notice.

"Notice of Substantive Change" ("Notice").  NEASC also would not approve the affiliation until the international program was underway and approved by the Israeli HEC.  In the June 9, 2004, email, LeBlanc referenced this problem as the "Catch 22" — "that NEASC wants to know we have licensure or authority to operate and [the Israeli HEC] wants to know we have NEASC approval."  IC Summ. J., Ex. BB.  Ne'eman wrote back, agreeing that the regulatory approval process "really is a Catch 22 situation."  IC Summ. J., Ex. EE.  On June 10, 2004, after speaking with Barbara Brittingham of NEASC, LeBlanc emailed Ne'eman a potential solution to the "Catch 22," which both parties agreed to follow.[4]

Later in June and into July of 2004, Martin Bradley, the new dean of SNHU's business school, submitted several documents and letters to the Israeli HEC.  In two letters dated June 30, 2004, Bradley referenced an agreement between the two schools.  In letter B-6, he wrote, "[t]he Israeli programs are governed by a contractual agreement with Israel College signed by the Presidents of both institutions."  IC Summ. J., Ex. GG, at 2.  In

---

[4]The two schools were able to work around the "Catch 22" when Barbara Brittingham of NEASC told LeBlanc that NEASC would issue a letter indicating that SNHU was accredited and that SNHU was "exploring a relationship with Israel College."  IC Summ. J., Ex. CC.  IC could then apply to the Israeli HEC using this letter.  On July 1, 2004, Ne'eman emailed SNHU that the "Catch 22" had been solved.

letter B-8, he wrote, "Southern New Hampshire University signed a letter of agreement with Israel College-Educational Horizons, Ltd. to jointly sponsor a Master of Business Administration program in Israel."  Id. at 3.  The Israeli HEC application was completed in early August of 2004.

In August and September of 2004, the two schools continued work on NEASC approval and prepared the Notice which was the document required for NEASC approval.  On September 21, 2004, LeBlanc emailed Ne'eman the final version of the Notice and told Ne'eman that he would draft a cover letter to send to NEASC.  The final version of the Notice begins: "Southern New Hampshire (SNHU) proposes a contractual relationship with Israel College[.] . . . The proposal is supplemented by two other documents: the actual Academic Supervision Agreement (ASA) and the draft legal contract (which also has the ASA contained in it)."  IC Summ. J., Ex. MM, Notice at 1, ¶¶1-2.  The Notice also states, "[t]he SNHU Board of Trustees has approved going forward with the proposed partnership at its January 23, 2004 meeting.  The Israel Board of Directors did the same.  We now seek NEASC approval to move forward."  Id. at 4, ¶7.

Also during September of 2004, Bradley spoke with other New England schools that were affiliated with IC.  Those conversations caused Bradley to have reservations about IC.

13

Bradley sent LeBlanc a series of emails summarizing his
conversations with the New England schools.  In one email,
Bradley outlined particular concerns based on a conversation with
Clark University.  In response, LeBlanc wrote, "[d]o we need to
revisit the ASA and contract to address some of Clark's
experiences?"  IC Summ. J., Ex. LL.

While Bradley investigated IC's relationship with other New
England schools, LeBlanc spoke with officials from NEASC.
According to LeBlanc, NEASC officials expressed a concern
suggesting that IC targeted "weaker institutions."  SNHU Obj.,
Ex. F, at 72.  When LeBlanc told the executive director of NEASC
that he had "serious doubts" about the affiliation with IC, the
NEASC official told LeBlanc that "the proposed partnership would
not enhance the quality of [SNHU's] international programming and
[he] agreed that [SNHU's] decision not to go forward was probably
for the best."  SNHU Obj., Ex. F, at 175, Ex. G, ¶23.

In late September, LeBlanc, Bradley, and SNHU's vice
president of academic affairs met to discuss IC.  At this
meeting, SNHU decided not to go forward with the affiliation with
IC.  On the same day as the meeting, LeBlanc emailed various
personnel at SNHU, stating that "Marty [Bradley] and I are poised
to pull the plug on the Israel College opportunity (see email
below; please keep that confidential.)"  IC Summ. J., Ex. II.

14

According to LeBlanc, SNHU could not go forward because SNHU
could not "provide an honest submission" to NEASC and because
SNHU could not fully endorse IC based on a set of "grave
concerns."  SNHU Obj., Ex. F, at 138-139.  As of late September
of 2004, the affiliation between IC and SNHU had not been
approved or denied by either the Israeli HEC or NEASC.

On September 29, 2004, LeBlanc sent an email to Ne'eman
stating that:

> As we completed our review work and due diligence, we began
> to question the value of the proposed partnership with
> Israel College.  Please understand, people spoke highly of
> your integrity and desire to provide solid quality programs
> to your students.  However, as we came to understand how the
> programs work and tried to map them to our aforementioned
> programming goals, the proposed partnership seemed
> increasingly ill suited to us and we have finally decided to
> not go forward with you[.]
>
> I am sorry that we had to proceed as far along [in] the
> process as we did before making this decision, but this is
> the kind of thing that happens in complex relationships and
> a process that calls for careful analysis and due diligence.

IC Summ. J., Ex. PP.

Ne'eman responded via telephone, and the two presidents
spoke regarding SNHU's decision.  LeBlanc wrote again on
September 29, 2004, following a SNHU management group meeting.
He told Ne'eman that SNHU had not changed its decision and that
"[t]he group shares my sympathy that this has not served you well
and that such processes in the future must be better structured

15

and due diligence needs to happen sooner.  For those
shortcomings, I am sorry, though better to discover the ill-fit
now than once we have signed a contract."  IC Summ. J., Ex. QQ.
Ne'eman responded via email, reminding LeBlanc that, "we already
have a signed contract . . . are not you aware of it?"  IC Summ.
J., Ex. RR.  LeBlanc replied, also via email, "we have a memo of
understanding that outlined intent."  Id.

### Discussion

IC argues that the undisputed facts show that SNHU breached
the Contract when it refused to go forward with the affiliation
between the two schools.  SNHU, relying on both the express terms
of the Contract and parol evidence, claims that there are genuine
issues of material fact regarding the parties' agreement, making
summary judgment improper.  Specifically, SNHU argues that: (1)
the Contract was not effective in September 2004 when it
withdrew; (2) the schools agreed that the Contract was a draft
subject to SNHU's completion of due diligence; and (3) the
Contract was a sham, signed only to initiate the lengthy review
process.  IC responds that the expressed conditions in the
Contract relate to performance obligations under the Contract and
not to whether the Contract was in effect.  IC also argues that
the parol evidence rule applies, barring evidence of any

16

agreement other than the Contract.  If parol evidence were
allowed, IC contends that the surrounding circumstances show that
the Contract was not a draft subject to due diligence and that
the Contract was not a sham.

A.   <u>Contract Terms</u>

        SNHU argues that it did not breach the Contract because it
was not in effect in September of 2004, when SNHU informed IC
that it would not go forward with their affiliation.  In support
of its argument, SNHU relies on an effective date provision,
referenced in both the ASA and the AA, and on a clause in the AA
that conditions implementation of the programs on regulatory
approval of the parties' plans.  IC contends that those
provisions governed the parties' obligations to perform under the
Contract but did not affect the formation of the Contract.

        1.   <u>Effective Date</u>

        LeBlanc signed the agreements on behalf of SNHU on April 23,
2004, and Ne'eman signed on behalf of IC on May 2, 2004.  The ASA
states that the agreement was "made the 2 day of May 2004" and
that it "is made pursuant to an Affiliation Agreement made
between the parties of even date and takes effect from the same
date as the Affiliation Agreement."  IC Summ. J., Ex. X.  The AA

17

includes a clause titled "Duration," which states that "[t]his agreement is effective from July 1st 2005 and unless terminated earlier pursuant to the provisions of Clauses 7.1, 7.2 and 7.3 continues on a rolling basis with annual review and termination at twenty four months notice and a four year teach out period." IC Summ. J., Ex. Y, ¶1.1.

SNHU argues that the Contract was not binding until the Duration clause's effective date, July 1, 2005, so that it was free to withdraw from the affiliation process in September of 2004.  Alternatively, SNHU contends that the Duration clause is ambiguous and offers extrinsic evidence to show that the parties did not intend to be bound by the Contract until the effective date.  IC asserts that the parties were bound by the Contract from the date it was made, May 2, 2004, and that the Duration clause unambiguously provides the date for performance under the Contract.

Under New Hampshire law, the interpretation of a contract, including whether the contract is ambiguous, is a question of law for the court to decide.  Behrens v. S.P. Constr. Co., Inc., 153 N.H. 498, 500 (2006).  The language used by the parties in the contract is given "its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole."  Carleton v.

<u>Edgewood Heights Condo. Owners' Ass'n</u>, ––– N.H. –––, 2007 WL 3306948 at *2 (Nov. 8, 2007).  Terms are construed to give effect to all provisions in the contract and to avoid rendering any provision meaningless.  <u>West v. Turchioe</u>, 144 N.H. 509, 516 (1999).  "A clause of an agreement is ambiguous when the contracting parties reasonably differ as to its meaning." <u>Behrens</u>, 153 N.H. at 503.

Neither agreement explains the relationship between the date the agreements were made and the effective date in the Duration clause.  The AA refers to the "effective date" as the date when SNHU warranted it would have "the capacity to accredit all courses offered on the campuses in Tel Aviv, Haifa, and Jerusalem . . . and to grant accredited degrees to students enrolled by IC."  IC Summ. J., Ex. Y, ¶2.1.4.  That provision suggests that the Duration clause's effective date was intended to be the date of the parties' performance under the Contract.

In <u>Schwenk v. Auburn Sportsplex, LLC</u>, 483 F. Supp. 2d 81, 86 (D.Mass. 2007), the court considered a contract that was "made and entered" on June 23, 2003 but also included a "closing date" of August 20, 2003.  In that case, the plaintiff argued that the contract was not effective until the "closing date."  <u>Id.</u>  The court disagreed, holding that such an interpretation "would render the 'made and entered' date entirely superfluous, and thus

19

violate the principle that agreements are to be interpreted so
that every word is given force and meaning." Id.  The court
reasoned:

> the contract clearly and unambiguously sets forth dates for
> two different events: (1) the date on which the contract was
> "made and entered" and (2) the date on which the closing was
> to occur–that is, the date on which the parties were to
> fulfill their principal obligations under the contract (for
> the plaintiff, delivering the purchase price, and for the
> defendants, delivering the ownership certificate).  The
> clear language of the contract thus provides that it became
> effective on June 23, 2003.

Id.

As in Schwenk, the Contract at issue here has two dates:
the date the Contract was made and the "effective date" in the
Duration clause.  SNHU's interpretation, that the parties were
not bound until the effective date, ignores the date the Contract
was made, giving that provision no effect at all, which is not a
reasonable interpretation of the Contract.  IC's interpretation,
that the parties were bound by their agreements on the date the
Contract was made but were not obligated to implement the agreed
provisions until the effective date, gives meaning to both dates
and is supported by the Contract taken as a whole.  Therefore,
because only IC's interpretation is reasonable, the Duration
clause is not ambiguous.[5]

---

[5]In addition, SNHU's interpretation would allow either party
to withdraw from the Contract unilaterally for more than a year

20

2.  Regulatory Approval

Clause 7.7 of the AA states that the "implementation of
these programs require [sic] approval both [sic] NEASC and the
Council for Higher Education in Israel."  Relying on this clause,
SNHU contends that because an express condition to the Contract,
NEASC approval, did not occur and could not occur given what SNHU
learned about IC in September of 2004, SNHU's performance was
excused and no breach occurred.  In effect, SNHU is arguing that
NEASC approval was a condition precedent to the formation of the
Contract.  IC responds that regulatory approval relates to
"implementation of the Contract and not to formation of the
Contract."  IC Summ. J. at 15.  At issue in this case, therefore,
is whether Clause 7.7 is a condition precedent to performance or
a condition precedent to formation.

"Conditions in contracts are construed in accordance with
their ordinary meaning."  In re Estate of Kelly, 130 N.H. 773,
781 (1988).  In New Hampshire, conditions precedent to
performance "'are those facts and events, occurring subsequently
to the making of a valid contract, that must . . . occur before

---

after the agreements were signed, which would likely violate both
the rule that agreements are not to be construed to put one party
at the mercy of the other and the implied covenant of good faith
and fair dealing.  See Holden Eng'g and Surveying, Inc. v.
Pembroke Road Realty Trust, 137 N.H. 393, 397 (1993); Centronics
Corp. v. Genicom Corp., 132 N.H. 133, 143 (1989).

there is a right to . . . performance.'"  Id. (quoting 3A A.
Corbin, Corbin on Contracts § 628, at 16 (1960)).  A condition
precedent to performance does not affect the underlying validity
of a contract.  See id.; see also Renovest Co. v. Hodges Dev.
Corp., 135 N.H. 72, 78 (1981).  When a condition relates to
formation, however, "the contract itself does not arise unless
and until the condition occurs.  This means each party is free to
retreat from the transaction until the condition occurs and a
contract is formed."  J. Calamari & J. Perillo, The Law of
Contracts § 11-5 at 415 (5th ed. 2003).  The court will not
construe a clause as a condition precedent to formation "unless
required by the plain language of the agreement."  Holden Eng'g,
137 N.H. at 396 (internal citations omitted).

    Clause 7.7 states that implementation of the planned
programs required regulatory approval.  In other words,
regulatory approval was an event that had to occur before the
parties could begin their joint program for educating students in
Israel.  The clause does not say that the formation of the
Contract was contingent on regulatory approval.  As such, Clause
7.7 is not a condition precedent to formation, but instead,
imposes a condition precedent to performance under an existing
agreement.  Therefore, although regulatory approval had not yet

22

occurred in September of 2004, SNHU's decision to withdraw from the Contract at that time is not excused by Clause 7.7.[6]

B.   Unwritten Agreements

SNHU argues that at the March 2004 meeting, the two schools agreed that the Contract was "conditioned on SNHU's satisfactory completion of due diligence and an investigation of the collaboration with Israel College."  SNHU Obj. at 12.  SNHU also contends that the two schools agreed at this meeting that the Contract would not bind the parties but was signed as a sham, only to allow the regulatory process to begin.  SNHU offers parol evidence to prove the existence of these agreements, which are not expressed in the Contract.  IC contends that parol evidence is not admissible because the Contract was completely integrated and because these unwritten agreements contradict the plain terms of the Contract.  IC also argues that if parol evidence is

---

[6]In addition, SNHU's interpretation, allowing either school to withdraw prior to regulatory approval, would likely violate the implied covenant of good faith and fair dealing because each party to a contract must make reasonable efforts to ensure the fulfillment of conditions precedent to performance.  See Centronics Corp., 132 N.H. at 143; see also 13 Richard Lord, Williston on Contracts § 39:4 (4th ed. 2000) (A party who "prevents the fulfillment of a condition precedent or its performance by the other party to the contract[,] cannot rely on the nonoccurrence of such condition to defeat his or her liability.").

admissible, the surrounding circumstances prior to, during, and
after the signing of the Contract demonstrate that the Contract
was a final, binding agreement.

### 1. Parol Evidence

New Hampshire recognizes exceptions to the parol evidence
rule.  Parol evidence is admissible to "establish that the
writing itself does not reflect the actual agreement reached by
the parties."  Sommers v. Sommers, 143 N.H. 686, 690 (1999).
Another exception allows parol evidence to prove that the parties
agreed that the formation of their contract was subject to a
condition precedent, even if the contract is integrated and
unambiguous.  LaPierre v. Cabral, 122 N.H. 301, 307 (1982); cf.
J. Calamari & J. Perillo, supra, § 3.7 at 144 (5th ed. 2003).

The New Hampshire Supreme Court has not had occasion to
consider whether an exception to the parol evidence rule exists
to prove that an agreement was a sham.  See, e.g. LaPierre, 122
N.H. at 307 (listing recognized exceptions).  "In the absence of
controlling state law, a federal court should choose the rule
that it believes the state's highest court is likely to adopt in
the future."  Amherst Sportswear Co., Inc. v. McManus, 876 F.2d
1045, 1048 (1st Cir. 1989).  The majority of courts that have
considered the issue have concluded that parol evidence is

admissible to prove a sham agreement.[7]  E.g. Herzog Contracting
Corp. v. McGowen Corp., 976 F.2d 1062, 1067 (7th Cir. 1992)
(internal citations omitted) ("It is well-settled that whatever
the formal documentary evidence, the parties to a legal
transaction may always show that they understand a purported
contract not to bind them; it may, for example, be a joke, or a
disguise to deceive others.").  An allegation that a contract is
a sham relates to a defect in contract formation, making it
similar to recognized exceptions to the parol evidence rule in
New Hampshire.  See LaPierre, 122 N.H. at 307.  Therefore, New
Hampshire would likely adopt the majority view.

     In this case, parol evidence is admissible to show that the
formation of the Contract was subject to the condition precedent
that SNHU complete due diligence.  Under the majority rule, parol
evidence is also admissible to show that the Contract was really
a sham, signed only to initiate the regulatory process.

---

     [7]The minority view does not allow parol evidence to prove a
sham agreement that would deceive a third party because it would
be offensive to public policy.  Kergil v. Central Oregon Fir
Supply Co., 323 P.2d 947, 948 (Or. 1958) ("The difficulty with
[the majority view] is that it overlooks the moral aspects of the
situation.  It permits the law to be used to lend its aid to
those who would mislead or defraud third parties without
providing any restraining penalty upon their immoral actions.");
see also Gagnon v. Fleury, 92 A.2d 470, 471 (Vt. 1952) (to allow
such evidence would be "morally beyond sanction").

2.  Surrounding Circumstances

IC argues that even if parol evidence is admissible, "the surrounding circumstances clearly show that the Contract was not a 'sham' and was not conditioned on further due diligence at the time it was signed."  IC Reply at 5.  To support this argument, IC offers evidence from the period of time prior to, during, and after the signing of the Contract.  SNHU offers conflicting evidence from each of these periods.

IC contends that as a result of the March 2004 meeting, there was a general agreement between the schools that they would move ahead with the affiliation.  IC claims that the schools did not enter into any other oral agreements at the March 2004, meeting.  According to Ne'eman, at the March 2004 meeting, LeBlanc asked "what should we do in order to go ahead?"  IC Summ. J., Ex. A, at 87.  After Ne'eman explained the process, LeBlanc said, "[l]et's go ahead" but nothing further.[8]  Id. at 89.  As further support that there were no additional oral agreements, IC points to Schneiderman's deposition testimony that he did not recall many details of the March meeting besides remembering that

---

[8]IC also contends that if the two schools agreed that the Contract had no binding effect at the March 2004 meeting, as suggested by SNHU, LeBlanc would have signed the Contract during the meeting, not one month later.

26

there was a "general agreement to move ahead."  IC Summ. J., Ex.
G, at 49.

IC also argues that the Contract was not subject to the due
diligence condition because SNHU completed its investigation of
IC just prior to signing the Contract.  Specifically, IC contends
that SNHU began its research of IC in 2002 when Schneiderman
visited IC.  IC claims that SNHU completed its investigation in
April of 2004 at the Natick dinner because LeBlanc extensively
questioned Mlynarsky, Featherman, and Brittingham and then told
Mlynarsky, when he walked her to her car, that he was satisfied
with the information that he learned at dinner and wanted to sign
the agreement with IC.  Because LeBlanc signed the Contract two
days later, IC contends that "LeBlanc had done enough due
diligence to satisfy himself that SNHU could enter into this
Contract with Israel College."  IC. Summ. J. at 15.

SNHU offers a conflicting version of the March 2004 meeting
and the April 2004 dinner.  LeBlanc stated in his affidavit that
he told Ne'eman at the March 2004 meeting that SNHU would have to
"conduct due diligence on the collaboration and have a full look
at [Israel College's] operations before [SNHU] could commit to a
partnership."  SNHU Obj., Ex. G, ¶7.  According to LeBlanc,
Ne'eman was eager to get a signed agreement in order to begin the
Israeli regulatory review process.  LeBlanc stated in his

27

affidavit that "[t]o accommodate [Ne'eman], we agreed at the meeting, that we would sign the documents to begin the process . . . [but] they would be subject to SNHU's satisfactory completion of due diligence[.]"  Id. ¶9.  In addition, LeBlanc testified at his deposition that SNHU agreed to sign the necessary documents at the March 2004 meeting to "begin our process" but only "as a favor" to IC.  SNHU Obj., Ex. F, at 50 and 164.

SNHU also argues that it did not complete its investigation just prior to signing the Contract.  SNHU claims that Schneiderman's 2002 visit was not typical of rigorous due diligence because he only visited for a single day, took a brief tour of the facilities, and listened to a presentation.  As to the April 2004 dinner, LeBlanc stated in his affidavit that "during dinner, the topics of conversation, other than social banter, included a very general discussion of Israel College.  I did not, however, engage in extensive questioning or discussion of Israel College's operations, programs, or management."  SNHU Obj., Ex. G, ¶¶13-14.  According to LeBlanc, he did not speak with Mlynarsky after dinner, he did not tell Mlynarsky that "he would sign the agreements," and "he did not escort Mlynarsky" to her car.  Id. ¶¶16-17.

28

IC also argues that when the Contract was signed, and in the period of time afterwards, both schools considered the Contract to be a final agreement.  IC offers the following evidence to support this argument: (1) a statement from Elizabeth Elwy (a former assistant dean at SNHU who was involved in the drafting process of the Contract) that SNHU considered the Contract was a formal agreement when it was signed[9]; (2) Ne'eman's April 25, 2004, email to the president of New England College that the agreement with SNHU was a "done deal"; (3) the correspondence between the schools in the months after the Contract was signed that does not reference any agreement the Contract was conditional or a draft; (4) the extensive effort displayed by both schools in completing applications to NEASC and the Israeli HEC; (5) the references in the Notice of Substantive Change that

---

[9]Elwy's original statement was unsworn, and SNHU challenged the statement as not competent under Federal Rule of Civil Procedure 56(e).  In its reply, IC submitted an affidavit from Elwy that incorporated the unsworn statement by reference and attested to its truth based on her personal knowledge of SNHU's relationship with IC.  SNHU has not challenged the affidavit. Elwy's affidavit provides a basis for her personal knowledge of the matters in her statement and certifies that the statement is true and correct under the pains and penalties of perjury.  SNHU has not challenged the affidavit.  Therefore, the affidavit is deemed to satisfy Rule 56(e) and is considered in support of IC's motion.  See 28 U.S.C. § 1746; OneBeacon Am. Ins. Co. v. Travelers Indem. Co., 465 F.3d 38, 44 (1st Cir. 2006); Perez v. Volvo Car Corp., 247 F.3d 303, 315-16 (1st Cir. 2001).

the SNHU board had approved going forward with the proposed partnership with IC; and (6) Bradley's letters submitted as part of the Israeli HEC submission stating that the two schools entered into an agreement.

SNHU counters that Elwy's statement is directly contradicted by LeBlanc's affidavit and deposition testimony that he considered the Contract to be a draft, conditioned on SNHU's completion of due diligence.  SNHU also offers conflicting evidence from the period of time after the document was signed suggesting that the parties considered the document was a draft. For example, SNHU points to a clause in the Notice of Substantive Change that states: "Southern New Hampshire (SNHU) proposes a contractual relationship with Israel College[.] . . . The proposal is supplemented by two other documents: the actual Academic Supervision Agreement (ASA) and the draft legal contract (which also has the ASA contained in it)."  IC Summ. J., Ex. MM, Notice at 1, ¶¶1-2.  Also, SNHU points to its email to IC after the signing of the Contract that it was merely "explor[ing] . . . a partnership."[10]  IC Summ. J., Ex. AA.  Because IC did not

---

[10]IC argues, without citation, that these statements and writings cannot be used to show SNHU's intent at the time the Contract was signed because they occurred after it was signed. Extrinsic evidence related to the subsequent understandings and conduct by parties to a contract is admissible.  MacKay v. Brealt, 121 N.H. 135, 140 (1981) and Restatement (Second)

correct these references, SNHU contends that IC considered the Contract to be a draft.

It may be, as IC urges, that a jury would disbelieve LeBlanc's account of the March 2004 meeting and the April 2004 dinner and credit Elwy's, Mlynarsky's, and Ne'eman's testimony and the other evidence that IC has presented.  Taking the facts in the light most favorable to SNHU, however, disputed facts remain about the March 2004 meeting and the April 2004 dinner, and there are inconsistent references to the Contract in the regulatory filings and other correspondence in the period of time after the Contract was signed.  These disputed facts and inconsistencies are material to whether the schools orally agreed in March 2004 that the Contract was conditioned on SNHU's completion of due diligence and to whether the Contract was really a sham signed only to initiate the regulatory review process.  Therefore, IC has not shown that it is entitled to summary judgment.

---

Contracts § 202 cmt. g (1981).  IC also argues these communications were insufficient to put it "on notice" that the Contract was not final.  Whether IC was "on notice" is a dispute of material fact because SNHU has offered evidence that LeBlanc told Ne'eman at the March 2004 meeting that any agreement between the two schools would not be a final, binding contract.

<u>Conclusion</u>

For the foregoing reasons, the plaintiff's motion for partial summary judgment on liability (document no. 15) is denied.  Although summary judgment on liability is not granted in the plaintiff's favor, certain matters are now resolved as a matter of law.  As construed in this order, the Contract's effective date, Clause 1.1 of the AA, is the date when the parties would have been obligated to perform and, therefore, does not affect the parties' agreement to affiliate for the purposes described in the AA and ASA.  The condition requiring regulatory approval, Clause 7.7 of the AA, is a condition precedent to performance, not a condition precedent to formation of the Contract and, therefore, does not affect the parties' agreement to affiliate for the purposes described in the AA and ASA.

The issues that remain unresolved are:

(1) whether the parties agreed, despite the written and signed agreements, that the Contract was an unenforceable draft unless and until SNHU completed its due diligence investigation, and

32

(2) whether the parties agreed that the Contract was merely a sham to allow the regulatory process to move forward.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

January 17, 2008

cc: Kristina H. Allaire, Esquire
    Christopher Cole, Esquire
    John P. McMorrow, Esquire
    John O. Mirick, Esquire
    John-Mark Turner, Esquire